IN THE UNITED STATES DISTRICT COURT
FOR THE SOUTHERN DISTRICT OF TEXAS
HOUSTON DIVISION

AMANDA K. BUCHANAN                §
                                  §
      Plaintiff,                  §
                                  §
vs.                               §   Civil Action No. H-04-3885
                                  §
HEEREMA MARINE                    §
CONTRACTORS U.S., INC.            §
                                  §
      Defendant.                  §

**MEMORANDUM OPINION**

Pending before the court is Defendant's Motion for Summary Judgment (Docket Entry No. 21), Defendant's Motion to Strike (Docket Entry No. 28) and the responses filed thereto. For the reasons discussed below, the court **GRANTS** Defendant's Motion to Strike and **GRANTS** Defendant's Motion for Summary Judgment.

**I.  Case Background**

Plaintiff, Amanda Buchanan ("Plaintiff"), began working for Heerema Marine Contractors, U.S., Inc. ("Heerema") as a temporary employee of a staffing company in June 2002. Approximately four months later, she became employed full time by Heerema and was assigned as a secretary for the Thunder Horse Project. In that position she reported to Rene de Koeijer ("de Koeijer"), project manager, and Jan Willem Leussink ("Leussink"), project engineer. Plaintiff provided administrative and secretarial support to approximately eight engineers and took immediate supervision from Connye Worn ("Worn"), the office manager for the group.

Plaintiff claims that, in August 2003, one of the engineers in

the group, John Bouwman ("Bouwman"), made offensive remarks to her during a company-sponsored golf outing. Specifically, Plaintiff alleges that at different times of the day, Bouwman told her she had "sexy" legs, appreciated the smell of her sweat, and said that he wished it would rain for a wet t-shirt contest.[1] Plaintiff claims that while at the outing, she approached de Koeijer when he was paying the bill and told him that Bouwman gave her "the creeps." She cannot recall any other complaint she made at that time, but claims that she followed up with an email to Worn. There is no extant copy of the email and Plaintiff cannot remember what the email said.[2] Plaintiff made no other complaints about Bouwman related to this outing.[3]

In October 2003, Plaintiff alleges that Bouwman called her "little girl." She did not complain about this until February 27, 2004.

Plaintiff also claims that Bouwman "inconveniently bump[ed] [her] in inappropriate places,"[4] and once wrapped his arms around her from behind.[5] She could not recall even one specific occasion but thought that he had "bumped" her on more than five occasions.[6]

---

[1] See Defendant's Motion for Summary Judgment, Docket Entry No. 21, Ex. B, "Deposition of Amanda K. Buchanan Bass," pp. 171-73, 176.

[2] Id. at p. 178.

[3] Id. at p. 176.

[4] Id. at p. 185. The inappropriate place was her chest.

[5] Id. at p. 185.

[6] Id. at p. 186.

Plaintiff did not report any touching incidents to management until February 27, 2004.

In December 2003, Plaintiff became engaged to another Thunder Horse project engineer, Jim Bass ("Bass"). Neither Plaintiff nor Bass told anyone of their relationship or engagement.

In January 2004, Bouwman sent several emails to Plaintiff on her company computer, asking her out on a date.[7] In spite of his

---

[7]

In an email sent January 12, 2004, Bouwman wrote:

I guess you have read the e-mail I sent you last Friday. Since you do/did not respond, can I assume I can pick you up on Saturday evening 19:00? Just kidding, please let me know if you want to do something nice/fun with me some time or not.

In an email sent January 13, 2004, Bouwman wrote:

I can understand I put you in an awkward situation, but the only thing you have to do is say yes (which would be my preference) or not or that you want to think about it. I don't want to push you too much, but pleeeeeeeeeeeeeeeeeeeeeease give me some sort of answer. If you want, you can also call me on my cell phone tomorrow, since I will be in a car most of the time.

Later on January 13, 2004, Bouwman wrote:

I don't give up very easy (you should know that after working with me for more than a year), so I have been thinking yesterday, how to convince you to go out with me on a date. I came up with the following:

-You can pick the movie, I am even willing to go to a chick flick and get you a medium popcorn and a medium soda at your choice.
-I will take you to your favorite restaurant: James Coney Island;-) and will buy you diner [sic]. So not going Dutch, which is very rare for a guy from Holland. I already made a reservation for a window seat for two, since a popular restaurant like James Coney Island is loaded during the weekend.:-)
-I will promise to make you laugh at least once. Maybe not around one of my stupid jokes, but for a stupid action from my side (which is not very difficult for me and happens to me a lot).
-If you run into a friend of yours, I won't mind if you denying [sic] to know me :-)
-For once you can pretend to be taller dan [sic] me.

entreaties for a response of some kind, Plaintiff did not directly
respond, but told him she was going to a wedding.  Apparently not
discouraged by this equivocal answer, Bouwman sent another email
two weeks later, again asking her out.[8]  Later that day, he

---

Of course the above is negotiable and I will not tell anyone you
went to dinner and a movie with me, if you will join me.  I hope I
convinced you, otherwise I still have 11 months, 2 weeks, and 3 days
to convince you (and maybe even longer).

Finally on January 13, 2004, Bouwman wrote:

    Amanda, I guess I can cancel the diner [sic] reservation
    for this weekend, since you have got a wedding to go to.
    So maybe the weekend after that?  Is it that difficult
    to say **yes** or no since you did not reply to any of my
    emails (I am not satisfied with a maybe offcourse)[sic].
    Or just tell me what to do to convince you to go with
    me.  I am willing to sacrifice another chocolate bar.

    I don't want to sent to [sic] many e-mails, maybe you
    are going to use them against me and are you going to
    sue me for harassment ;-) and will I loose [sic] my job.

    Just let me know.  I promise I will not bite.

Defendant's Motion for Summary Judgment, Docket Entry No. 21, Ex. 13.

[8]    On January 26, 2004, Bouwman wrote:

    Amanda, Maybe this will make it easier for you to give
    me an answer.  Just pick one of the options below :-)

A.   I would love to go out with you, pick me up Saturday 19:00
B.   I would love to go out with you, let's pick a date
C.   I would love to go out with you, but I am grounded this
     month, so next month
D.   I would love to go out with you, only if I can pick the
     restaurant and the movie
E.   I don't want to go out with you, stop harassing me
F.   I don't want to go out with you, I am already seeing somebody else
G.   I don't want to go out with you, but I will hook you up with
     one of my friends
H.   Maybe I want to go out with you, try to convince me
I.   Maybe I want to go out with you, just buy me some presents
     and I will reconsider
J.   Maybe I want to go out with you, write me a long poem/song
K.   Maybe I want to go out with you, I you [sic] ask me on your
     knies [sic] you might be lucky.
L.   ..................................

appeared to concede defeat in an email.[9]   The following day,
January 27, 2004, Bouwman apologized for his earlier emails but
again sought a definitive answer from Plaintiff to his request for
a date, even if the answer was "no."[10]  Two days later, on January
29, 2004, Bouwman sent another email, apparently attempting to
smooth over some office event which he felt needed an explanation.[11]

---

Id.

[9]

Under a heading entitled, "You win," Bouwman wrote:

Amanda, You win.  I will give up. I will stop sending you e-mails
(not work-related), sending things to your house and bring [sic] you
gifts.  It is clear to me you are not interested because otherwise
you would have replied to one of my e-mails.  A simple NO would have
been enough for me.  Maybe you are different than I thought (hoped)
you were after all.

Id.

[10]     Bouwman wrote:

Amanda, Sorry for my behavior, but I am a little bit confused and
don't exactly [sic] how to react.  I hope you understand and that
you don't blame me too much for it.  I just hoped that you could
give me an answer to my e-mails I sent you the past two weeks.  It
is really killing me not knowing what to do.  So even when the
answer is no, please let me know.

Again sorry for my behavior.

Id.

[11]

Amanda, It looks like you on [sic] no speaking terms with me, so
maybe I can explain without getting into details by this e-mail what
happened yesterday (if you want the full story, I can tell you
another time).

We were wondering if you would be in the office yesterday, so I
asked around if anyone knew.  At a certain moment someone said as a
joke (not me) that Jim had to know since he had inside information.
Jim denied this and then I said that he is the one closest to you,
since you were taking his presentation home with you, while he had
the presentation the next day, so probably delivered it at his home
at night.  If this is true or not, does not matter, since these
things are private and whatever you (and Jim or whoever) are doing
is not our business.  I did not see the harm in making a joke about
it since a couple of weeks ago, the same jokes were made about me

On February 16, 2004, Bouwman again emailed Plaintiff and asked for an answer to his previous emails and her new cell phone number.[12] Plaintiff did not directly respond to this email, but in her reply to a business-related email sent by Bouwman asking for her help on arranging for the purchase of t-shirts for the group, she ignored his pleas for a direct yes or no answer and gave an ambiguous answer to his request for her telephone number.[13]

---

and Barbara Groskamp when I had dinner with her. Everybody was making fun of me and she was my little girlfriend, etc. It was the first time I brought the presentation thing up in front of everybody, the first time, I just sent it to you by email.

One more time, I am really really really sorry if I offended you, that was never my intention. There is nothing I am telling about you I will /do not tell you straight in your face.

You know I am still trying to convince you to know what [sic]. I just want to know if you don't mind, since I don't want to offend you and don't want to embarrass myself too much (I already do that a lot ;-) I have/am working on some more ideas to convince you. I will stop immediately if you don't appreciate this or if the chance of you actually agreeing is 0.000000000000000%.

Id.

[12]

Bouwman wrote:

Little girl, Will there be any chance you are going to give me an answer to the e-mails I sent you a couple of weeks ago?? Or do I need to try harder, or do you want me to give up?

Please let me know, I don't want to do things you do not appreciate.

And offcourse [sic] I would like to have your new cell phone, or am I the reason you changed to a new number...

Id.

[13]

Plaintiff responded:

I think that I could have a lot of fun with that... I will get some things together. How many? By the way, I changed my number not for any particular reason... but the person that had the number before me has a lot of weird incoming calls... I had to get away from that. Also it is fine that a few people have my new number but I don't

Bouwman renewed his request for her phone number and promised not to give it to anyone else.[14] After Plaintiff invited Bouwman to meet with herself and the t-shirt vendor, Bouwman again asked for an answer to his request for a date.[15]

On February 20, 2004, Plaintiff sent Bouwman an email thanking

---

want it posted anywhere!

Amanda

Id.

[14] Bouwman stated:
I already had Loren performing some work, so we can discuss what we want to have. The T-shirts will be for both the Thunder Horse projects. So probably 500 T-shirts and maybe 50 nice polo's [sic].

If you don't mind, I would still like to have your phone number. I promise I won't give it to anyone. I just like to give you a call once in a while. And I am still trying to convince you offcourse [sic] I like doing things like that, but as mentioned before, if you don't like it, just let me know (by the way, I had to cancel my original plan because I was not home before Friday). If there is not chance at all, I would rather know this, so I am not embarissing [sic] myself too much.

Id.

[15] Bouwman wrote:

Amanda, I know you are avoiding the subject, but I still have some questions for you and I really hope you can give me an answer (because I don't want to look too desperate). I really do not have a clue if you appreciate the attention I am giving you (by the way did everything arrive I sent to your home). If you were interested in my proposal, I would think you would have given me an answer by now. On the other hand, if you were not interested, the only thing you had to do is just say no and that would be it. So I hope you understand I am a little confused and that this situation is driving me crazy. What I have been doing is definitely not a joke. If you are already involved with someone (Jim or someone else;-) or want me to stop than [sic] I respect that and I will leave you alone. Then everything will be just work related. I know you don't want people to get involved in your personal life and that is not a problem. The only thing you have to do is let me know what you want. So no matter what your answer will be, I think you are a wonderful person, I like you and you will always be my favorite project secretary.

him for a get well gift.[16]  Bouwman immediately responded, "As long
as everything is ok with you, that's the most important thing!!!
I hoped it cheered you up a little bit ;-)."  Plaintiff responded,
"Yes, it did!"[17]

Perhaps encouraged by Plaintiff's positive response and the
lack of a definite "no," Bouwman made another attempt to get
romance advice for a "friend" from Plaintiff in an email sent after
5 p.m.[18]  The following Monday, February 23, 2004, not hearing from

---

[16]
Plaintiff wrote:

Thank you so much for the Get Well gift, that was very nice.

Id.

[17]    Id.

[18]
Bouwman wrote:

Hey Girl, Maybe you can give me some basic advise [sic] from a woman
to a man.  I have friend, who really wants to go out with a
beautiful girl he likes.  Even though he realizes that the girl is
way out of his league, he still had the guts to ask her out on a
date.  So maybe diner [sic] go to a movie, the basic stuff.  He does
not know her very well and wants to get to know her.  He does not
know if she is already seeing someone.  So he sent to an e-mail
asking her to go out with him.  She did not reply, so maybe she was
playing hard to get, so he sent her some more e-mails (including
multiple choice options) and he sent her a dozen roses.  She still
did not reply.  At that moment he got really confused, because he
did not want to be too pushy, but he really wanted to know what her
answer was, even if the answer was that she was already seeing
someone or that she did not like him at all and wanted him to leave
her alone (so at least he knew, and could have a decent night of
sleep again:-)  So he did not ask her for a reply for two weeks.
Then Valentine [sic] day came and he really wanted her to know how
he felt, so he sent her some valentine cards.  Still no reply.  So
he asked me if I knew a beautiful popular girl who might have an
answer to his problem.  I told him that I would ask the project
secretary at my work.  So do you know what a guy should do in a
situation like that.  Should he go on his knees an ask her, just
leave her alone, continue sending her flowers and cards, or is she
playing a game with him and is laughing about all the stupid things
he does together with her (boy)friend(s).

Plaintiff, Bouwman emailed Plaintiff inquiring if she had any advice for his friend. Plaintiff responded and again gave an equivocal, "Yea, [sic]... I will email you my advice in just a little bit!"[19]

On Wednesday, February 25, 2004, Bouwman sent Plaintiff an email asking her to scan some work, thanking her in advance for the scanning, and requesting an answer to his earlier emails.[20] Later that evening, Bouwman emailed to Plaintiff, "Amanda, have I done something terribly wrong (again) that you are not replying to my business related mails [sic]?? Please let me know because since I do stupid things all the time, I really don't know what I did wrong this time."[21]

On February 26, 2004, Plaintiff wrote to Bruce Gresham, president of Heerema, complaining that Bouwman had created a hostile work environment. In the letter, Plaintiff complained about the "suggestive" email messages, the inappropriate touching, phone calls to her cell phone, and the receipt of flowers at her home address. Plaintiff complained that Bouwman had obtained her

---

Maybe you can help him.......

Thanks in advance, John

<u>Id.</u>

[19] <u>Id.</u>

[20] <u>Id.</u>

[21] <u>Id.</u>

address from her personnel file and made terroristic threats.  She related to Gresham that she had had three meetings with Leussink concerning Bouwman's conduct with no results.  Plaintiff concluded that she felt she had no other alternative than to file a formal complaint of discrimination.

An internal investigation was initiated and both Plaintiff and Bouwman were placed on paid leave.  Bouwman denied making any threats to Plaintiff but admitted sending her emails.  It was discovered that several of the emails Plaintiff sent to her home computer had been altered after they arrived in her inbox, with threatening and suggestive material added.  Plaintiff denied altering the emails before forwarding them to her home computer.[22]

On March 11, 2004, Bouwman was terminated for misusing a company computer.  On March 12, 2004, Plaintiff was notified that her paid leave was over and to report to work on Monday, March 15, 2004.  Plaintiff reported to work on March 15, 2004.  She took vacation leave for the remainder of the week.  On Monday, March 22, 2004, Plaintiff called in sick.  On March 23, 2004, Plaintiff reported to work, but left the office at 8:30 a.m. without notifying her supervisors.  She never returned to work and never

---

[22]
On March 30, 2005, the court ordered Plaintiff to turn over her home computer for inspection by Defendant's computer expert.  Between March 31, 2005, and April 6, 2005, two thousand one hundred seventy-nine files were deleted from this home computer.  After an evidentiary hearing on September 28, 2005, the court sanctioned Plaintiff for this deliberate spoliation of evidence by prohibiting her from introducing the "home computer" version of the emails sent by Bouwman. Accordingly, the court has reproduced the Bouwman emails using the wording found on Plaintiff's office computer.  See Docket Entry No. 36.

formally resigned her position.

Plaintiff filed suit in state court on June 16, 2004, alleging negligence and intentional infliction of emotional distress. Plaintiff later amended this suit to include sex discrimination allegations. On October 6, 2004, Heerema removed the case to this court.

## II.  Summary Judgment Standard

Summary judgment is warranted when the evidence reveals that no genuine dispute exists regarding any material fact and the moving party is entitled to judgment as a matter of law. Fed. R. Civ. P. 56(c); Celotex Corp. v. Catrett, 477 U.S. 317, 322 (1986); Brown v. City of Houston, 337 F.3d 539, 540-41 (5th Cir. 2003). The movant must inform the court of the basis for the summary judgment motion and must point to relevant excerpts from pleadings, depositions, answers to interrogatories, admissions, or affidavits that demonstrate the absence of genuine factual issues. Celotex Corp., 477 U.S. at 323; Topalian v. Ehrman, 954 F.2d 1125, 1131 (5th Cir. 1992).

If the moving party can show an absence of record evidence in support of one or more elements of the case for which the nonmoving party bears the burden, the movant will be entitled to summary judgment. Celotex Corp., 477 U.S. at 322. In response to a showing of lack of evidence, the party opposing summary judgment must go beyond the pleadings and proffer evidence which establishes each of the challenged elements of the case, demonstrating that

11

genuine issues of material fact do exist which must be resolved at trial. Id. at 324.

The nonmoving party must show more than "some metaphysical doubt as to the material facts." Meinecke v. H & R Block of Houston, 66 F.3d 77, 81 (5th Cir. 1995). Conclusory allegations, unsubstantiated assertions, improbable inferences, unsupported speculation, or only a scintilla of evidence will not carry this burden. Brown, 337 F.3d at 541; Ramsey v. Henderson, 286 F.3d 264, 269 (5th Cir. 2002).

### III. Motion to Strike Plaintiff's Affidavit

Affidavits are competent summary judgment evidence if made on personal knowledge provided they set forth facts admissible in evidence and show that the affiant is competent to testify regarding the matters contained. FED. R. CIV. P. 56(e).

Defendant Heerema argues that Plaintiff's affidavit, which was submitted after her deposition was taken, directly conflicts with portions of her deposition testimony and should be stricken. The general rule is that a court must consider all summary judgment evidence presented and is not at liberty to strike an affidavit because it conflicts in some measure with a previous deposition even if the differences raise an issue of credibility. Kennett-Murray Corp. v. Bone, 622 F.2d 887, 893 (5th Cir. 1980).

An exception to this rule is warranted where a nonmovant offers a contradictory affidavit in order to "manufacture a disputed material fact where none exists." Albertson v. T.J.

<u>Stevenson & Co., Inc.</u>, 749 F.2d 223, 228 (5th Cir. 1984); <u>see also</u>, <u>Kennett-Murray Corp.</u>, 622 F.2d at 894.

In the present case, Plaintiff's deposition is a model of obfuscation. Plaintiff answered that she did not remember, did not know, or could not recall in response to, by the court's count, seven hundred questions. In response to Defendant's motion for summary judgment, Plaintiff has attached an affidavit in which she now provides more specific times, new events, and new conversations with supervisors with no explanation of how her memory has been refreshed on these important topics. The affidavit does far more than simply supplement prior answers. See <u>Kennett-Murray Corp.</u>, 622 F.2d at 894.

Seven hundred responses of "I don't remember" or the equivalent is extraordinary. Plaintiff was either coached not to respond to questions or has an incredibly bad memory. If this lack of recall was a result of trial strategy, it cannot be condoned. On the other hand, if Plaintiff had no recall of the events which underpinned this lawsuit at the time of her deposition, her inability to recall even basic facts deprived the Defendant of the opportunity to conduct a meaningful deposition. It would be unfair to allow Plaintiff to defeat summary judgment by an eleventh hour recollection of events which comes with no explanation of how her memory was refreshed.

Defendant's motion to strike the affidavit of Plaintiff is **GRANTED**.

# IV.  Analysis

## A.  Title VII - Hostile Work Environment

To state a claim for co-worker[23] hostile work environment, a plaintiff must prove that: (1) she belongs to a protected class; (2) she was subjected to unwelcome harassment; (3) the harassment complained of was based on a protected characteristic; (4) the harassment adversely affected a term, condition, or privilege of her employment; and (5) the employer knew or should have known of the harassment and failed to take remedial action.  See Celestine v. Petroleos de Venezuella SA, 266 F.3d 343, 353 (5th Cir. 2001). Where the plaintiff alleges she was harassed by a supervisor with immediate or successively higher authority over her, she need only satisfy the first four elements.  Faragher v. City of Boca Raton, 524 U.S. 775, 807 (1998); Felton v. Polles, 315 F.3d 470, 484 (5th Cir. 2002).  Once the plaintiff makes this showing, the employer is

---

[23] In her response to Defendant's Motion for Summary Judgment, Plaintiff argues that Bouwman was her supervisor.  In her deposition, Plaintiff stated that she directly reported to de Koeijer, Leussink, and Worn.  Defendant's Motion for Summary Judgment, Docket Entry No. 21, Ex. B, pp. 60, 87.  She also testified that all the project engineers, including Bouwman, gave her secretarial work to do, through de Koeijer.  Id. at p. 88.  Plaintiff attempts to characterize this ability to assign work as "supervisory."  Applying this rationale, everyone in the Thunder Horse project would have been her supervisor except another secretary.

However, under Title VII, a supervisor is a person with immediate or successive higher authority over the employee and who exercises significant control of the employee's hiring, firing, or conditions of employment.  See Parkins v. Civ. Constr. of Ill., Inc., 163 F.3d 1027, 1033 (7th Cir. 1998); Rosales v. City of San Antonio, 2001 WL 1168797 *7 (W.D. Tex. 2001). Plaintiff's conclusory arguments to the contrary, the court does not believe that Plaintiff has raised a fact issue that Bouwman was her supervisor.  However, as the court finds that Plaintiff's hostile work environment fails on another ground, i.e., that she did not suffer a "severe" or "pervasive" hostile work environment, this potential issue does not preclude summary judgment.

subject to vicarious liability for the discriminatory acts of its supervisor. Faragher, 524 U.S. at 807.

For a hostile work environment claim to be actionable, the plaintiff must show that the harassment was sufficiently severe or pervasive to alter the terms or conditions of employment and create an abusive work environment. Meritor Sav. Bank, FSB v. Vinson, 477 U.S. 57, 67 (1986); Celestine, 266 F.3d at 353. To this end, the plaintiff must prove her work environment was both subjectively and objectively hostile, i.e., the plaintiff must subjectively perceive the unwelcome harassment as being severe or pervasive, and this subjective perception must be objectively reasonable. Harris v. Forklift Sys., Inc., 510 U.S. 17, 21-22 (1993); Frank v. Xerox Corp., 347 F.3d 130, 138 (5th Cir. 2003); Septimus v. Univ. of Houston, 399 F.3d 601, 611 (5th Cir. 2005).

In determining whether a workplace is hostile or abusive, the court examines all circumstances, and focuses on factors such as the frequency of the discriminatory conduct; its severity; whether the conduct is physically threatening or humiliating, or instead a mere offensive utterance; and whether it unreasonably interferes with an employee's work performance. Walker v. Thompson, 214 F.3d 615, 625 (5th Cir. 2000)(quoting Harris, 510 U.S. at 23).

In the present case, Plaintiff suffered no physically threatening or humiliating conduct at the hands of Bouwman.[24] The

---

[24] Plaintiff's speculation that Bouwman mutilated a picture of her is not competent summary judgment evidence and will not be considered.

emails sent by Bouwman were neither overtly sexual nor objectively offensive, even if they were unwelcome.  Based on the sentiments expressed in the emails, a simple "no," would likely have ended Bouwman's pursuit of a date with Plaintiff, along with the related outpourings of flowers, cards, and telephone calls.

The "inconvenient bumping" in "inappropriate places," on several occasions, coupled with Bouwman's inappropriate comments at the golf outing do not rise to the level of "severe" or "pervasive" sexual harassment.  In <u>Shepard v. Comptroller of Pub. Accounts</u>, 168 F.3d 871, 874 (5th Cir. 1999), the court found that a co-worker's comments that the plaintiff had big thighs while pretending to look up her skirt and that her elbows were the color of her nipples, and conduct such as rubbing plaintiff's arm, trying to look down her clothing, and patting his lap to encourage her to sit there, were boorish and offensive, but not "severe."   <u>Shepard</u>, 168 F.3d at 872.  The court concluded that this was not the type of conduct which would interfere unreasonably with a person's work performance.

Similarly, in an unreported decision, <u>Hockman v. Westward Communications, L.L.C.</u>, 122 F.App'x. 734 (5th Cir. 2004), the court found that a coworker's conduct, including making comments about the plaintiff's body, brushing up against her breasts and behind, slapping the plaintiff's behind with a newspaper, attempting to kiss her, and blocking her exit from the ladies' restroom, did not rise to the level of "severe" sexual harassment.  <u>Hockman</u>, 122 F.

App'x. at 743.

In light of case law finding similar conduct not sufficiently severe to warrant a triable fact issue, the court has no difficulty concluding that Plaintiff's hostile work environment claim fails for the same reason.[25] Defendant's motion for summary judgment is **GRANTED** on this claim.

### B. <u>Title VII - Retaliation</u>

In order to establish a *prima facie* case for unlawful retaliation under Title VII Plaintiff must prove that: (1) she engaged in a protected activity; (2) she experienced an adverse employment action; and (3) a causal link existed between the protected activity and the adverse employment action. <u>Walker</u>, 214 F.3d at 628-29; <u>Webb v. Cardiothoracic Surgery Assoc. of N. Texas</u>, 139 F.3d 532, 540 (5th Cir. 1998). The Fifth Circuit has viewed an adverse employment action as an ultimate employment decision such as "hiring, granting leave, discharging, promoting, and compensating." <u>Walker</u>, 214 F.3d at 629 (quoting <u>Dollis v. Rubin</u>, 77 F.3d 777, 782 (5th Cir. 1995)); <u>see also</u> <u>Webb</u>, 139 F.3d at 540. A short period of time between the report of harassment and the retaliation may provide the necessary causal connection for a prima facie case. <u>Evans v. City of Houston</u>, 246 F.3d 344, 354 (5th Cir. 2001)(noting that a time lapse of four months has been found

---

[25] In light of this finding, the court does not discuss Defendant's argument that it took prompt remedial action.

sufficient to establish a causal connection for purposes of summary judgment).

Defendant argues that Plaintiff was not terminated, rather, that she quit. Plaintiff responds that she engaged in a protected activity when she reported sexual harassment to management. Subsequently, she asserts, her work conditions became so intolerable that she was forced to resign. Therefore, she argues, she has established a prima facie case for retaliation.

A resignation is actionable under Title VII only if it can be characterized as a "constructive discharge." Brown v. Kinney Shoe Corp., 237 F.3d 556, 566 (5th Cir. 2001). To prove a constructive discharge, a plaintiff must establish that her working conditions were so intolerable that a reasonable employee in her position would have felt compelled to resign. Woods v. Delta Beverage Group, Inc., 274 F.3d 295, 301 (5th Cir. 2001) (quoting Faruki v. Parsons, S.I.P., Inc., 123 F.3d 315, 319 (5th Cir. 1997)); Brown v. Bunge Corp., 207 F.3d 776, 782 (5th Cir. 2000). Whether a reasonable employee would feel compelled to resign depends on the particular facts of the case. Tyler v. Union Oil Co. of Cal., 304 F.3d 379, 394 (5th Cir. 2002) (quoting Barrow v. New Orleans, 10 F.3d 292, 297 (5th Cir. 1994)).

When determining whether a constructive discharge occurred, the court considers whether any "aggravating factors" are present, such as: (1) demotion; (2) reduction in salary; (3) reduction in job responsibilities; (4) reassignment to menial or degrading work;

and (5) badgering, harassment, or humiliation by the employer calculated to encourage the employee's resignation. Barrow, 10 F.3d at 297.

The court finds that Plaintiff has failed to present evidence that her conditions at work were so utterly intolerable that a reasonable person in her position would have felt no choice but to resign. Plaintiff admitted that, to the best of her recollection, she had not been demoted, her salary was never reduced, and she received no degrading or demeaning work assignments.[26]

After her complaint about Bouwman's conduct, she was granted time off with pay and never had contact with Bouwman again. Plaintiff was informed by management that Bouwman had been terminated, that she would be returned to her secretarial position under the direct supervision of Leussink, and that her supervisor had been reminded to evaluate her work performance as though no complaint of discrimination had been made and to take no action against Plaintiff which could be viewed as retaliatory.[27]

Plaintiff returned to work on Monday, March 15, 2004, worked one day and took vacation leave for the rest of the week. On Monday, March 22, 2004, Plaintiff called in sick. She left work on March 23, 2004, never to return. Plaintiff has failed to supply

---

[26]
See Defendant's Motion for Summary Judgment, Docket Entry No. 21, Ex. B. "Deposition of Amanda K. Buchanan Bass," pp. 276-79.

[27]
See Defendant's Motion for Summary Judgment, Docket Entry No. 21, Ex. A(7).

even one fact after her return to work on March 15, 2004, in support of her constructive discharge allegation. Accordingly, the court finds that Plaintiff has failed to raise a fact issue that she was constructively discharged. Plaintiff's retaliation claim fails for want of a tangible employment action. Defendant's motion for summary judgment is **GRANTED** on this claim.

## C. <u>Intentional Infliction of Emotional Distress</u>

A plaintiff must provide evidence on four elements to establish an intentional infliction of emotional distress claim ("IIED"): (1) the defendant acted intentionally or recklessly; (2) the defendant's conduct was extreme and outrageous; (3) the actions of the defendant caused the plaintiff emotional distress; (4) the emotional distress was severe. <u>GTE Southwest Inc. v. Bruce</u>, 998 S.W.2d 605, 611 (Tex. 1999). Defendant argues that Plaintiff cannot satisfy the second element as a matter of law.

Whether a person's conduct is "extreme and outrageous" is a question of law for the court. <u>Bradford v. Vento</u>, 48 S.W.3d 749, 758 (Tex. 2001). Conduct on behalf of the defendant is actionable only when it is "so outrageous in character, and so extreme in degree, as to go beyond all possible bounds of decency, and to be regarded as atrocious, and utterly intolerable in a civilized community." <u>Twyman v. Twyman</u>, 855 S.W.2d 619, 621-22 (Tex. 1993). The Texas Supreme Court has held that "mere insults, indignities, threats, annoyances, petty oppressions, or other trivialities do not rise to the level of extreme and outrageous behavior." <u>GTE</u>

20

<u>Southwest</u>, 998 S.W.2d at 612.

The court finds that, although the conduct Plaintiff challenges in this action was unwanted and unsuitable to the workplace, it does not surpass the legal threshold needed to show "extreme and outrageous" behavior. In <u>Walker</u>, the Fifth Circuit determined that the plaintiffs failed to meet this element of their IIED claims, even though they had stated a claim for hostile work environment. 214 F.3d at 628. The plaintiffs in that case, both black females, had endured racially offensive remarks for over three years and were subjected to, among other things, comparisons to slaves and monkeys, derisive remarks regarding their African heritage, patently offensive remarks regarding the hair of African-Americans, and conversations in which a co-worker and a supervisor used the term "nigger." <u>Id.</u> In reaching its decision, the court found guidance from a Texas court of appeals decision, <u>Thomas v. Clayton Williams Energy, Inc.</u>, 2 S.W.3d 734, 740-41 (Tex. App.—Houston [14th Dist.] 1999), in which the court held that a supervisor's frequent use of racial epithets against the employee did not rise to the level of extreme and outrageous conduct. <u>Id.</u>

The court is unable to conclude that the harassment Plaintiff experienced was any more extreme or outrageous than the type found to exist in <u>Walker</u>. Therefore, <u>ipso facto</u>, Plaintiff cannot meet one of the essential elements of her prima facie case, and her IIED claim must fail. Defendant's motion should be **GRANTED** on this claim.

**D. Negligent Hiring/Supervision**

In her Original Petition Plaintiff alleges that Defendant negligently subjected her to abusive working conditions. Plaintiff's negligence claim is barred by the exclusive remedy provision of the Texas Workers' Compensation Act. TEX. LAB. CODE § 408.001; Ward v. Bechtel Corp., 102 F.3d 199, 203-04 (5th Cir. 1997)(plaintiff's sexual harassment claims, characterized in terms of failure to provide a safe work place, negligent hiring, supervision and retention were foreclosed by the Workers' Compensation Act's exclusivity provision). Thus, Plaintiff's claims of negligence against her employer fail.

**V. Conclusion**

On the basis of the foregoing, the Defendant's Motion for Summary Judgment is **GRANTED** in all respects.

SIGNED this 5th day of October, 2005, in Houston, Texas.

Nancy K. Johnson
United States Magistrate Judge